# EXHIBIT A

**BOIES, SCHILLER & FLEXNER LLP**
David Boies (*Pro Hac Vice* appl. pending)
(dboies@bsfllp.com)
333 Main Street
Armonk, NY 10504
Tel: (914) 749-8200; Fax: (914) 749-8300

David Zifkin (SBN 232845) (dzifkin@bsfllp.com)
Shira Liu (SBN 274158) (sliu@bsfllp.com)
401 Wilshire Boulevard, Suite 850
Santa Monica, CA 90401
Tel: (310) 752-2400; Fax: (310) 752-2490

**KIRKLAND & ELLIS LLP**
Jay P. Lefkowitz (*Pro Hac Vice* pending)
(lefkowitz@kirkland.com)
Nathaniel J. Kritzer (*Pro Hac Vice* pending)
(nathaniel.kritzer@kirkland.com)
601 Lexington Ave
New York, NY 10022
Tel: (212) 446-4800; Fax: (212) 446-4900

*Additional counsel identified on signature page*

*Attorneys for Plaintiff PALANTIR TECHNOLOGIES INC.*

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF SANTA CLARA

## UNLIMITED JURISDICTION

| | |
|---|---|
| PALANTIR TECHNOLOGIES INC., a Delaware corporation,<br><br>*Plaintiff,*<br><br>v.<br><br>MARC L. ABRAMOWITZ, in his individual capacity and as trustee of the MARC ABRAMOWITZ CHARITABLE TRUST NO. 2, KT4 PARTNERS LLC, a Delaware limited liability company, and DOES 1 through 50, inclusive,<br><br>*Defendants.* | Case No. 16CV299476<br><br>**SECOND AMENDED COMPLAINT FOR:**<br>(1) Breach of Contract<br>(2) Breach of the Implied Covenant of Good Faith and Fair Dealing<br>(3) Violation of Cal. Civ. Code § 3426 et seq.<br>(4) Violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 et seq.<br><br>**JURY TRIAL DEMAND**<br><br>Complaint Filed: September 1, 2016<br>Trial Date: Not set |

Plaintiff Palantir Technologies Inc. ("Palantir"), for its First Amended Complaint against defendants Marc L. Abramowitz ("Abramowitz"), both in his individual capacity and as trustee of the Marc Abramowitz Charitable Trust No. 2 (the "Trust"), KT4 Partners LLC ("KT4"), and Does 1 through 50 (collectively with Abramowitz, KT4, and the Trust, "Defendants"), alleges as follows:

## NATURE OF THE ACTION

1.      This is an action to stop Defendants from misappropriating Palantir's confidential information and proprietary trade secrets for their own benefit and to prevent them from receiving any additional confidential or proprietary information from Palantir pursuant to an Investors' Rights Agreement.

2.      Abramowitz was a respected confidant and advisor to Palantir and its senior executives until he betrayed the trust they bestowed upon him for his own personal gain.  He was, through KT4 and other entities, an early equity investor in Palantir who personally engaged in regular discussions with executives about some of the company's most sensitive business strategies and trade secrets.  Those discussions were highly confidential, as was made clear by express written agreements among the parties at the time and a course of dealing based on the most basic principles of fairness and honesty between a trusted shareholder and advisor and Palantir's management and business personnel.

3.      Nonetheless, as part of brazen scheme to claim Palantir's highly confidential information and trade secrets as his own, Abramowitz stole those secrets, engaged in methodical deception of Palantir's senior executives, and made false claims to the United States Patent and Trademark Office (USPTO).  Abramowitz's claim to be a patent innovator is directly contradicted by the facts surrounding his professional career and his interactions with Palantir.

4.      To start, Abramowitz has no notable history as an inventor or patent innovator in the data analysis area.  He has made most of his career and fortune in real estate and buyout investing.  Yet, beginning in 2014, Abramowitz suddenly filed five patent applications with the USPTO, all of them based on trade secrets he stole from Palantir.  This was plainly illegal and

highly unethical conduct, and it was a betrayal of his trusted relationship with Palantir and its executives.

5.     But Abramowitz's scheme did not end there.  After stealing from Palantir, he has continued to employ false pretenses in an effort to further exploit his relationship with Palantir and extort confidential information from the company.  Among other things, Abramowitz has made a series of unwarranted demands upon the company to obtain sensitive financial and other information.  In a transparent ploy to seek leverage for his demands, Abramowitz has resorted to concocting a false story that Palantir intentionally interfered with his attempt to sell his Palantir shares to an international firm.  Those allegations are spurious.  The international firm that Abramowitz claims was prepared to purchase his shares was actually identified to Palantir as a potential direct investor by a third party unaffiliated with Abramowitz well *before* Abramowitz raised them as a potential purchaser.  Far from interfering with Abramowitz's efforts, Palantir specifically instructed its agents to stand down from any attempt to sell stock to this potential buyer, and Palantir never sold any stock to this potential buyer.  Palantir also stood ready to assist Abramowitz with a sale of his shares—as it had done in the past—if his discussions with the potential buyer ever became serious.  They never did.  That international firm did not invest in Palantir, either by purchasing Abramowitz's shares or from Palantir directly.

6.     Nonetheless, Abramowitz has now hired lawyers and has brought an action in Delaware state court to demand from Palantir sensitive and confidential information about the company, including its finances and business dealings, which Palantir considers to be, and treats as, highly sensitive and confidential.  Having uncovered Abramowitz's breach of Palantir's trust (and of his contractual obligations to Palantir under multiple agreements), it is apparent that Abramowitz is not seeking this information in good faith or for a proper purpose.  In fact, history has shown that, unlike Palantir's other investors, Abramowitz has and will misuse any information provided to him in breach of confidence, causing Palantir irreparable harm in the process.

7.     Through his vague allegations of supposed interference, Abramowitz is attempting to convert speculative discussions regarding a potential sale into a ploy to disparage Palantir, obtain unwarranted access to the company's books and records, and divert attention away from his own misconduct.  Abramowitz's conduct has forced Palantir to take steps to protect itself, such as amending its corporate documents, proceeding before the USPTO, and bringing this action, by which Palantir seeks redress for Abramowitz's breaches of contract, breaches of confidence, and misuse of Palantir's confidential and proprietary information and trade secrets.

**PARTIES, JURISDICTION, AND VENUE**

8.     The Court has jurisdiction over this action by virtue of Article VI § 10 of the California Constitution and California Code of Civil Procedure § 410.10.

9.     Palantir is a Delaware corporation with its principal place of business at 100 Hamilton Avenue, Palo Alto, California, 94301.  Palantir has suffered, and continues to suffer, injury in this jurisdiction by reason of Defendants' actions.

10.     Palantir is informed and believes and on that basis alleges that defendant Marc L. Abramowitz is an individual residing in San Francisco, California.  Palantir is informed and believes and on that basis alleges that Abramowitz is the trustee of the Marc Abramowitz Charitable Trust No. 2.  The wrongful actions of Abramowitz occurred in, were targeted to, and caused damage in, California.

11.     Palantir is informed and believes and on that basis alleges that defendant KT4 Partners LLC is a Delaware limited liability company with its principal place of business in San Francisco, California.  On information and belief, KT4 does business in California and has committed acts that submit it to the jurisdiction of California's courts.  Upon information and belief, Abramowitz is the sole member of KT4 and controls and directs the activities of KT4.  The wrongful actions of KT4 occurred in, were targeted to, and caused damage in, California.

12.     Palantir is ignorant of the true names of Does 1 through 50 and such names are fictitious.  Such defendants are legally responsible for the events and happenings described herein

and for the damages proximately caused thereby.  Once Palantir learns of the true names of Does 1 through 50, Palantir will amend the complaint to include the real name(s) of such party or parties.

13.    This action is founded on injuries and damages suffered by Palantir in Santa Clara County by virtue of the Defendants' misappropriation of trade secrets, breach of contract, breach of confidence and other illegal and wrongful acts as alleged in this Complaint.  Venue is proper in this Court because Plaintiff resides in this County, the harm caused by Defendants occurred in this County, and the events that form the basis for this Complaint largely took place in this County.

**FACTUAL BACKGROUND**

**<u>Palantir's Business and the Trade Secrets and Other Confidential Information at Issue</u>**

14.    Palantir is a software and services company that specializes in data analytics.  In 2004, Palantir was founded on a vision: to provide solutions not only to problems then faced by business and government, but also solutions to problems that did not yet exist, but that would surely come to be as part of our rapidly-evolving world.   It sought to make this vision a reality by the use of technology.  And it embarked on an ambitious, time-consuming, and costly endeavor to create a viable, successful business.  As a result of hard work and investment, Palantir has succeeded and is now a leader in its industry. Today, Palantir's products are deployed at the most critical government, commercial, and non-profit institutions in the world to solve problems the company's founders had not even dreamed of back in 2004.

15.    In particular, at its founding, Palantir set out to create products that would transform the way organizations use what is perhaps their most important asset in today's business world, data.  Palantir's mission has been and remains to develop flexible tools and services to provide human-driven analysis of real-world data, with a focus on creating the world's best user experience for working with data.  To achieve this, Palantir builds platforms for integrating, managing, and securing data, on top of which it layers applications for fully interactive, human-driven, machine-assisted analysis.   This means that Palantir develops programs and provides services that allow businesses, governments and other entities to run their operations in a way that corresponds with the reality of their marketplace and consumers.

4

SECOND AMENDED COMPLAINT

16.     Businesses and governments use Palantir's software to interpret and visualize large quantities of information from various sources.  For example, businesses use Palantir's software to analyze internal and external data to better assess cyber risks, and government agencies use Palantir's software to analyze intelligence data to better understand emerging threats.

17.     Palantir's success is due in part to its early recognition that many organizations are traditionally unable to identify problems and leverage insights from their internal data because it is held in separate silos that are often disconnected and have different access, security controls, and privacy requirements.  When information is siloed—that is, when important information is stored in containerized, unrelated units—businesses and governments cannot fully realize the potential of that data.  Palantir provides software solutions that avoid this problem, allowing users to run their businesses consistent with the actual environment in which they operate.  Thus, Palantir's products are used to fuse and analyze customer data across platforms and sources and enable secure collaboration among analysts, while protecting data privacy and security.

18.     As is expected in this type of work, Palantir is also heavily involved in research and development.  Palantir spends millions of dollars each year to expand its business and seek out new opportunities—and to stay ahead of the curve and atop the industry.  This research and development investment involves both creating new software, technologies and processes and adapting existing products and technologies to new applications and uses.

19.     As described in more detail below, this litigation concerns, among other things, Defendants' misappropriation of Palantir's proprietary trade secret and business information concerning Palantir's technologies and/or use cases for (i) interpreting and analyzing data in the healthcare space for clinical drug trials and for health insurance risk assessments (the "Healthcare Technology"); (ii) cyber insurance technology and related cybersecurity technology for use of customer consortia to improve cybersecurity; (the "Cyber Insurance and Cybersecurity Technology"); and (iii) interpreting and analyzing data in connection with natural resources exploration and management (the "Natural Resources Exploration Technology").  It also concerns Defendants' misappropriation of Palantir's trade secret business plans and customer lists related to

these technologies.  Palantir employed reasonable efforts to maintain the secrecy of these trade secrets, which have had substantial economic value because they were not generally known to the public or others in the industry at the time of Defendants' misappropriation.

**Palantir Scrupulously Protects Its Trade Secrets and Other Confidential Information**

20.     Palantir undertakes significant efforts to protect the confidentiality and security of its trade secrets, property (including physical locations, intellectual property, and network security), as well as sensitive and confidential business and financial information.

21.     Palantir employs both technical and physical safety measures to maintain the security of its property and confidential information.  Among other things, Palantir restricts employees' access to sensitive internal information such that individual employees can only access such data after obtaining appropriate authorization and only to the extent necessary to perform their jobs.  Additionally, Palantir employs a multitude of technical security measures to protect its systems and networks, including, among other methods: intrusion detection systems, network monitoring tools, anti-malware software, network firewalls, and whole disk encryption of employee computers.  Palantir's network and security systems are also continually monitored for potential security risks.  To secure access to information and data no matter where employees are, Palantir uses and requires complex password requirements and two-factor authentication for access to its hardware and its network.

22.     In addition to data and network security, physical access to Palantir's facilities is also highly restricted.  Palantir employees must use electronic badges to access Palantir facilities.  Access to certain sensitive areas of Palantir's facilities is further restricted to a small subset of Palantir employees with a specific need for access (including, for example, Palantir facilities containing network servers and security equipment, among others).  Visitors must be invited to Palantir facilities, must sign in and wear a visitor badge, and are escorted at all times.  In addition, certain areas of Palantir's facilities are off limits to visitors, and Palantir deploys security guards to protect its facilities.

23.     Palantir also implements numerous measures and policies to ensure that its employees safeguard the confidentiality and security of its trade secrets and sensitive and confidential business information.  As part of the hiring process, Palantir requires pre-employment background checks for all new employees and also requires legal training for new hires, covering confidentiality, information and data security, and compliance.

24.     Palantir has employed all of the methods described above, among others, to maintain the confidentiality of the trade secrets and other confidential information at issue in this action.

### Abramowitz's Relationship with Palantir

25.     Initial funding for Palantir came from a variety of sources, including the company's founders who remain with Palantir today as shareholders of common shares of Palantir stock. Abramowitz, through KT4 and other entities he controls, was an early investor in Palantir, first investing in the company in 2005.

26.     Through the years, Abramowitz was involved with the business of Palantir.  Rather than acting as a passive investor, he became a regular fixture at Palantir.  Between 2010 and 2015, Abramowitz visited Palantir offices over thirty times.  Indeed, Abramowitz spent so much time at Palantir that in 2014 he requested an office at the company.

27.     Abramowitz established relationships with the company's founders, officers, and employees.  As a result, he was viewed as a trusted investor and advisor by the company, including several founders and senior employees.  Abramowitz fostered these relationships of confidence and held himself out as a friend of, advisor to, and investor in Palantir, whose interests were completely aligned with the company.  He made clear that he could be trusted to keep confidences and act in the company's best interests.  When Abramowitz had questions about Palantir's business, including financial information, that were relevant to his status as a shareholder, trusted advisor and confidant to the company, he was provided the information with the understanding that it would remain confidential.

28.     In this context, Abramowitz often inquired about specific Palantir projects.  On several occasions, Palantir provided information to Abramowitz in his capacity as a shareholder

and advisor about concepts for new technology and use cases for technology that Palantir had spent significant time and resources researching, developing and testing, including the Healthcare Technology, Cyber Insurance and Cybersecurity Technology, and Natural Resources Exploration Technology.   At Abramowitz's request, Palantir also provided him with information about proprietary business plans and customer lists for these technologies.  Palantir always provided any such information to Abramowitz subject to an express and reasonable understanding that Abramowitz would maintain its confidentiality, that he would never pass Palantir's concepts and trade secrets off as his own, and that he would never use the information to Palantir's detriment or without Palantir's permission.

29.   Consistent with the confidential nature of these communications, Palantir and Abramowitz entered into confidentiality agreements.

30.   For example, in a Preferred Stock Transfer Agreement, dated August 14, 2012, Abramowitz agreed "to keep confidential and refrain from using or disclosing all agreements, documents and other information regarding the Company or its securityholders provided or made available to [Abramowitz]…in [his] capacity as a stockholder of the Company…."  Abramowitz renewed that confidentiality agreement in a Preferred Stock Transfer Agreement, dated June 17, 2015.

31.   Similarly, in a Preferred Stock Transfer Agreement also dated June 17, 2015, KT4 agreed "to keep confidential and refrain from using or disclosing all agreements, documents and other information regarding the Company or its securityholders provided or made available to [Abramowitz]…in [his] capacity as a stockholder of the Company…."

32.   Abramowitz also executed an NDA, dated July 12, 2014 (the "July 2014 NDA"), covering "Proprietary Information," which is defined in the NDA as "non-public business, technical or other information, materials and/or ideas of Palantir [including] anything you learn or discover as a result of exposure to or analysis of any Proprietary Information."  The NDA expressly forbids Abramowitz from using or revealing any of Palantir's Proprietary Information.  Abramowitz repeatedly met with Palantir employees, including high-level executives, to seek out Palantir's

8

confidential and trade secret information. During these meetings, Abramowitz assured Palantir employees, through his words, his conduct, and the written confidentiality agreements between the parties, that he would maintain the confidentiality of any confidential or trade secret information he obtained from Palantir and that he would not misuse such information.

**Abramowitz's Misappropriation of Confidential Business Information and Trade Secrets**

33.     In breach of multiple confidentiality agreements and confidential relationships with Palantir, Abramowitz disclosed Palantir's confidential information and trade secrets, and misrepresented and concealed the true nature of his interactions with Palantir.

34.     Abramowitz met with top Palantir executives at Palantir's offices, in local restaurants and coffee shops, and in the home of at least one such executive.  During these meetings Abramowitz routinely pressed Palantir employees to provide confidential information about the company.  The degree of Abramowitz's interest in Palantir's developing projects, client lists, and other confidential information separated him from the typical investor.  With the expectation that Abramowitz would not disclose this confidential information or use it to the detriment of Palantir, these employees provided Abramowitz with information about, among other things, the industries Palantir identified as areas where its technology could be applied, potential clients, potential partners and details regarding those evolving relationships.

35.     By 2014, Abramowitz had embarked on an intentional and calculated scheme to discover Palantir trade secrets and convert them for his own use and profit.  Abramowitz violated the trust Palantir put in him by, at a minimum, misappropriating the above-described trade secrets related to the Healthcare Technology, the Cyber Insurance and Cybersecurity Technology, and the Natural Resources Exploration Technology.

36.     **The Healthcare Technology.**  Since 2010, Palantir worked extensively to identify the most effective way to enter and advance the clinical trial space.  As a result of this work, Palantir developed proprietary and trade secret technology and data analytics services to improve the design of clinical trials of prescription drugs by pharmaceutical companies and academic institutions.  For example, this proprietary technology and data analytics services can interpret and analyze various

data for purposes of patient recruitment in clinical trial.  In conjunction with developing this technology, Palantir developed proprietary business plans, customer lists and use cases that are also trade secrets.  Palantir has made reasonable efforts to maintain the confidentiality of these trade secrets.

37.     In the healthcare space, Palantir also worked extensively to develop proprietary technology and data analytic services to perform insurance risk assessments, including, for example, patient diagnoses not accounted for by health insurance companies and healthcare fraud risks.  In conjunction with developing this technology, Palantir developed proprietary business plans, customer lists and use cases that are also trade secrets.  Palantir has made reasonable efforts to maintain the confidentiality of these trade secrets.

38.     As a trusted investor and advisor, Abramowitz learned proprietary trade secret information concerning the Healthcare Technology through his communications with Palantir about Palantir's research and development work, technology, business plans, use cases, and customer lists in this area.

39.     At all times, Abramowitz knew that this information was confidential and proprietary, and that he needed Palantir's permission before disclosing any of it.  As described above, Abramowitz entered into confidentiality agreements with Palantir.  Moreover, in his communications with Palantir, Abramowitz made clear that he understood the information Palantir provided to him was confidential.

40.     In February 2014, Abramowitz sought to broker a deal between Palantir and a customer.  Had the introduction resulted in a finalized deal, Abramowitz would have received a fee for the introduction.  Consistent with the confidential nature of their communications, the draft agreement between Abramowitz and Palantir for this fee contains a confidentiality provision.  Even though this potential customer understood that it was also obligated to maintain the confidentiality of any information received, Palantir advised Abramowitz that he could provide this potential customer only with limited information.

41.     After it was clear that the introduction would not result in a finalized deal – and despite knowing that Palantir invented the Healthcare Technology and that it was confidential trade secret information – Abramowitz misappropriated Palantir's inventions and trade secrets in this space, has improperly disclosed them in an effort to profit from them, and has attempted to patent them as his own.

42.     On October 29, 2014, without Palantir's knowledge or consent, Abramowitz filed Provisional Application No. 62/072,368 with the United States Patent and Trademark Office ("USPTO") seeking to patent systems, methods and concepts concerning the Healthcare Technology that were developed by Palantir and explained to Abramowitz in confidence.  The application falsely identifies Abramowitz as the sole inventor of the Healthcare Technology, includes no mention of Palantir at all, and fails to list a single Palantir employee as an inventor.

43.     On information and belief, in his effort to market the Healthcare Technology as his own and to profit from it, Abramowitz has also improperly disclosed trade secret information related to the Healthcare Technology to others.

44.     In addition to misappropriating Palantir's trade secret Healthcare Technology, Defendants breached their confidentiality agreements when they filed the patent application and disclosed Palantir's confidential information to others.

45.     **The Cyber Insurance and Cybersecurity Technology.** Palantir engaged in research and development to build technology to assist companies in the cyber insurance and cybersecurity space.  Beginning in 2013, Palantir began developing trade secret systems and methods for companies to better defend themselves against cyberattacks to their networks by sharing cyberattack data among various participants in Palantir's system.  Palantir developed trade secret technology, business plans, use cases, and customer lists to implement these cybersecurity systems and methods.  Palantir often referred to this project as "CyberMesh" or "Cyber Consortium."  Additionally, Palantir developed related systems, methods, technologies, business plans, uses cases, and customer lists that were specific to improving cyber insurance.  For example, Palantir expanded upon its existing cyber security technologies to develop technology to more

accurately measure the risk of a cyberattack and thus enable insurers to provide products to protect customers against the risk of cyberattacks.  Palantir has made reasonable efforts to maintain the confidentiality of these trade secrets.

46.     Abramowitz requested information and participated in discussions about Palantir's Cyber Insurance and Cybersecurity Technology trade secrets.

47.     In June 2014, a Palantir executive disclosed to Abramowitz during a conversation that Palantir was working on opportunities in the insurance industry, including opportunities related to cyber insurance.  When Abramowitz expressed interest in these concepts and requested additional information, the Palantir executive arranged for Abramowitz to speak with another Palantir executive, who sent Abramowitz trade secret information on these concepts via email and invited Abramowitz to meet with him at Palantir's offices to discuss them.  During his June 2014 meeting with Abramowitz, this Palantir executive further described the two related concepts that Palantir had developed relating to cyber insurance and the use of customer consortia to improve cyber security.

48.     When Abramowitz next met with Palantir on the subject, he indicated he was interested in setting up a Palantir subsidiary that he would run to perform the insurance-related function Palantir had revealed to him.  In addition to his express confidentiality agreements with Palantir, Abramowitz's indication of interest in establishing a subsidiary further indicated that these discussions in June 2014 were confidential communications made solely for the benefit and interest of Palantir.  Palantir ultimately decided not pursue the subsidiary Abramowitz suggested.

49.     After Palantir decided not to pursue the subsidiary Abramowitz desired – and despite knowing that Palantir invented the Cyber Insurance and Cybersecurity Technology and that it was confidential trade secret information – Abramowitz misappropriated Palantir's inventions and trade secrets in this space, has improperly disclosed them in an effort to profit from them, and has attempted to patent them as his own.

50.     Without Palantir's knowledge, on October 21, 2014, Abramowitz filed Provisional Application No. 62/066,716 at the USPTO attempting to patent systems, methods and concepts

related to Palantir's Cyber Insurance and Cybersecurity Technology as his own, claiming to be the invention's sole owner and inventor. Once again, Abramowitz's application failed to mention Palantir and did not include a single Palantir employee as an inventor.

51.     Presumably unbeknownst to Abramowitz, Palantir had filed its own patent application on certain inventions related to the Cyber Insurance and Cybersecurity Technologies, on May 16, 2014, months before Abramowitz learned of the systems, methods, techniques and concepts from Palantir; that application resulted in United States Patent No. 9,009,827, dated April 14, 2015, which is owned by Palantir and was invented by Palantir employees. During the pendency of that application, the information contained in it remained confidential trade secret information. Moreover, that patent application and patent does not disclose other trade secret information related to the Cyber Insurance and Cybersecurity Technology (e.g., business plans, use cases), which was disclosed to Abramowitz in confidence.

52.     On information and belief, in his effort to market the Cyber Insurance and Cybersecurity Technology as his own and to profit from it, Abramowitz has also improperly disclosed trade secret information related to the Cyber Insurance and Cybersecurity Technology to others.

53.     In addition to misappropriating Palantir's trade secret Cyber Insurance and Cybersecurity Technology, Defendants breached their confidentiality agreements when Abramowitz filed the patent application and disclosed Palantir's confidential information to others.

54.     **The Natural Resources Exploration Technology.**  Palantir engaged in research and development to create a more effective way for natural resources exploration companies to mine data. Palantir was able to adapt its existing data analysis technologies to develop this new proprietary and trade secret technology. In conjunction with developing this valuable technology, Palantir also developed proprietary business plans, use cases and customer lists that are also trade secret. Palantir has made reasonable efforts to maintain the confidentiality of these trade secrets.

55.     After discussions with Palantir employees concerning Palantir's work on adapting its data analysis technology for use in oil and gas exploration, Abramowitz again sought to patent

Palantir's systems, methods and concepts by filing Provisional Application No. 62/094,888 with the USPTO on December 19, 2014, and falsely claiming to be the sole owner and inventor. As with his other applications described above, Abramowitz filed the application without Palantir's knowledge or consent and failed to credit Palantir or its employees in any way.

56.    On information and belief, in his effort to market the Natural Resources Exploration Technology as his own and to profit from it, Abramowitz has also improperly disclosed trade secret information related to the Natural Resources Exploration Technology to others.

57.    In addition to misappropriating Palantir's trade secret Natural Resources Exploration Technology, Defendants breached their confidentiality agreements when they filed the patent application and disclosed Palantir's confidential information to others.

58.    After Palantir learned of one of Abramowitz's improper patent applications, a senior Palantir executive went to meet with him at Jean-Georges, a high-end French restaurant located in the Trump International Hotel & Tower in Manhattan, where Abramowitz regularly conducted business meetings and was known to "hold court". At that time, Abramowitz did not deny that his patent applications contained confidential or trade secret information obtained from Palantir, but claimed that he filed the patent application for Palantir's benefit. That statement was plainly false, and was presumably designed to induce Palantir to delay challenging Abramowitz's patent application and filing suit for misappropriation of trade secrets and breach of contract. Indeed, Abramowitz has neither withdrawn any of his improper patent applications nor amended them to indicate that Palantir is the inventor and owner of the systems, methods and concepts described therein.

59.    Through his scheme, Abramowitz intentionally abused his status as an investor and trusted advisor in an attempt to profit at Palantir's expense by improperly using and disclosing multiple Palantir trade secrets and improperly attempting to patent them as his own. On information and belief, despite Abramowitz's lack of experience in these areas, he is attempting to market them as his own. Additionally, he could, for example, attempt to use Palantir's trade secrets to hold Palantir hostage in exchange for royalties. Abramowitz's actions are causing Palantir irreparable

14

1    harm, and Palantir is therefore separately seeking to have Abramowitz's patent applications denied

2    by the USPTO.

3         60.    The foregoing facts are not the only indications that Abramowitz has sought to profit

4    from Palantir's trade secrets.  As Abramowitz knows, Palantir's company name is inspired by the

5    "seeing stones" referenced in The Lord of the Rings.  Without Palantir's knowledge, Abramowitz

6    filed for a trademark on the mark "Shire," which is also referenced in The Lord of the Rings as the

7    place where one of the main characters lives.  It is clear that Abramowitz has filed this trademark

8    application in an attempt to further improperly associate himself with the Palantir brand.

9         61.    Significantly, Abramowitz filed this trademark application with an intent to use the

10   mark in connection with "underwriting and administration of cyber liability insurance;

11   underwriting and administration of cyber security insurance; insurance brokerage in the field of

12   cyber liability and cyber security insurance."  This further reflects that Abramowitz is using, and

13   intends to continue to use, Palantir's trade secrets in these areas.

14        **Abramowitz Demands Information Under the Investors' Rights Agreement**

15        62.    In the months following Abramowitz's filing of false patent applications,

16   Abramowitz continued to employ false pretenses in an effort to further exploit his relationship

17   with Palantir and extort confidential information from the company.  Abramowitz has made a

18   series of unwarranted demands upon the company to obtain sensitive financial and other

19   information, including through a demand letter (that KT4 has since withdrawn) and through a

20   rambling, nonsensical, and unsupportable complaint that KT4 filed in Delaware state court.  In a

21   transparent ploy to seek leverage for those baseless demands, Abramowitz has resorted to

22   concocting a false story that Palantir intentionally interfered with his attempt to sell his own

23   Palantir shares to an international firm.  Those allegations are spurious.  The international firm

24   that Abramowitz claims was prepared to purchase his shares was actually identified to Palantir as

25   a potential direct investor by a third party unaffiliated with Abramowitz well *before* Abramowitz

26   raised them as a potential purchaser.

27

28

63.     Far from interfering with Abramowitz's efforts, Palantir specifically instructed its agents to stand down from any attempt to sell stock to this potential buyer to allow Abramowitz to attempt to complete a sale.  Palantir also stood ready to assist Abramowitz with a sale of his shares—as it had done in the past—if his discussions with the potential buyer ever became serious.  They never did.  That international firm did *not* invest in Palantir, either by purchasing Abramowitz's shares or from Palantir directly.  Through these vague allegations of supposed interference, Abramowitz is attempting to convert a speculative transaction into a ploy to wrongfully disparage Palantir, obtain unwarranted access to the company's books and records, and divert attention away from his own misconduct.

### Palantir and Major Investors Amend the IRA to Protect Palantir, its Employees, and Shareholders from Malicious Actors

64.     Having discovered Abramowitz's actions, his betrayal of Palantir's trust, and his misappropriation of its trade secrets—and fearing more such betrayals and breaches of confidence that remain undiscovered—Palantir could no longer trust Abramowitz with its confidential information, including the information demanded by KT4 in the baseless Delaware action.

65.     To further protect Palantir—as well as its employees, former employees, investors, and other shareholders—from the malicious acts of Defendants, on September 1, 2016, Palantir and a group of its Major Investors holding a majority of the Registrable Securities held by Major Investors invoked their rights under Section 3.7 of the July IRA to amend the agreement (the "Amendment").  Even assuming KT4 was a Major Investor with rights under Sections 2.1 and 2.2 of the July IRA and even assuming that Defendants' unclean hands did not preclude them from receiving any confidential information through the IRA, KT4 has no such rights under the current IRA; the Amendment is expressly retroactive in its effect, as permitted by Section 3.7 of the IRA.

66.     Palantir did not take this action lightly, but after receiving KT4's demand for sensitive information following the nefarious activities of Defendants through their access as investors and Abramowitz's former status as an advisor, Palantir determined that it was necessary to act to protect itself and others from the harmful actions of Defendants.

67.     To be clear:  Palantir regularly and frequently works with investors, upon request, to provide relevant information corresponding to their status as a shareholder, subject to confidentiality obligations.  As it has done in responding to Abramowitz's reasonable questions in the past, Palantir stands ready to do the same with KT4 upon a showing that such requests are being made in good faith and with no improper purpose.

### Harm to Palantir

68.     As a result of Defendants' actions, Palantir has been and will continue to be injured in an amount to be established according to proof.

69.     As a result of Abramowitz's unauthorized copying, theft, and misappropriation of Palantir's confidential and proprietary information and trade secrets, as well as his co-opting of Palantir's work developing technology, systems, methods, and concepts and subsequently passing them off as his own, Palantir has been and will continue to be injured absent equitable relief.

### FIRST CAUSE OF ACTION

### (Breach of Contract – Against All Defendants)

70.     Palantir hereby realleges, as if set forth fully herein, the allegations of paragraphs 1 through 69.

71.     Defendants' contracts with Palantir, including, *inter alia*, the Transfer Agreements and the July 2014 NDA (the "Confidentiality Contracts"), imposed a contractual obligation on Defendants to maintain the confidentiality of information learned or accessed as a result of Defendants' investments in Palantir, Abramowitz's visits to Palantir's offices, and his discussions with Palantir employees.

72.     The Transfer Agreements, signed by Abramowitz on behalf of the Trust, is a valid contract and all conditions precedent to its enforcement have been performed by Palantir.

73.     The July 2014 NDA, signed by Abramowitz, is a valid contract and all conditions precedent to its enforcement have been performed by Palantir.

74.     Under the Confidentiality Contracts, Defendants agreed to hold in strictest confidence, and not to use, except for the benefit of the company, any information they obtain or access as investors or during visits or discussions.

75.     As described above, Defendants breached the Confidentiality Agreements when Abramowitz used the information he learned from Palantir employees to file patent applications listing himself as sole inventor of Palantir's systems, methods and concepts that he learned in confidence, as well as a trademark application on "Shire" that they intend to use in the cyber insurance space.  Defendants further breached their confidentiality obligations when they disclosed confidential information to others in an improper effort to profit from Palantir's confidential information and trade secrets.

76.     As a direct and proximate result of Defendants' wrongful conduct, Palantir has been harmed and is being forced to take expensive steps to reduce and mitigate that harm.

77.     In addition to equitable relief, Palantir demands monetary damages, fees and costs, where allowed.

## SECOND CAUSE OF ACTION

**(Breach of the Implied Covenant of Good Faith and Fair Dealing– Against All Defendants)**

78.     Plaintiff repeats and realleges paragraphs 1 through 77 above as though fully set forth herein.

79.     California law implies a covenant of good faith and fair dealing in all contracts.

80.     The Transfer Agreements, signed by Abramowitz on behalf of the Trust, is a valid contract and all conditions precedent to its enforcement have been performed by Palantir.

81.     The July 2014 NDA, signed by Abramowitz, is a valid contract and all conditions precedent to its enforcement have been performed by Palantir.

82.     Defendants have unfairly interfered with Plaintiff's right to receive the benefit of the Transfer Agreements and July 2014 NDA by, among other things, misappropriating and using Plaintiff's proprietary, confidential, and trade secret information and falsely claiming to have invented Palantir's inventions.

83.     In addition, the IRA, as amended, is a valid contract and all conditions precedent to its enforcement have been performed by Palantir.

84.     Defendants have unfairly interfered with Plaintiff's right to receive the benefit of the IRA by, among other things, using it to seek confidential information for improper purposes. As a result, Palantir is being forced to take expensive steps to reduce and mitigate that harm.

85.     Defendants have breached and violated its implied covenant of good faith and fair dealing.

86.     As a result of that breach by Defendants, Plaintiff has suffered monetary damages in an amount to be quantified at trial.

**THIRD CAUSE OF ACTION**

**(Violation of California's Unfair Competition Law,**

**Cal. Bus. & Prof. Code Section 17200 *et seq.* – Against All Defendants)**

87.     Plaintiff Palantir repeats and realleges paragraphs 1 through 86 above as though fully set forth herein.

88.     Defendants have engaged in (and continue to engage in) the unlawful, fraudulent, and unfair business acts and practices described throughout this Complaint in violation of California's Unfair Competition Law (the "UCL"), California Business and Professions Code, Section 17200, *et seq*.

89.     Defendants' business acts and practices were unlawful under the UCL because they resulted in the violations of state common law described herein, including breach of the implied covenant of good faith and fair dealing through misleading and fraudulent means.

90.     Defendants' business acts and practices were fraudulent because Defendants misrepresented and concealed the true nature of their acts and practices through the use of false and misleading statements to Palantir and others.  A reasonable person would likely be deceived by Defendants' false statements and claims, including:

a.     False statements and representations relating to their ownership of Palantir's confidential information, as described in ¶¶ [44, 53, 57 (non-

19

1    trade secret "to others" allegations); 42, 50, 55 (re: false statements to

2    PTO)];

3    b.    Representations that Abramowitz would maintain the confidentiality of the

4    confidential information that Palantir shared with him, as described in

5    ¶¶ [26-32, 48 (re: relationship with Palantir)]; and

6    c.    Statements to a Palantir employee that the patent applications were filed for

7    Palantir's benefit, as described in ¶ [58].

8    91.    Defendants have engaged in unfair business acts and practices in violation of the

9    UCL by, among other things, acting in bad faith, concealing the true nature of their acts and

10   practices, and threatening and harming competition in the market for the technologies described

11   herein.  The harm suffered by Palantir described herein outweighs any justification that

12   Defendants may assert for engaging in those acts and practices.  Moreover, Palantir could not

13   have avoided the harm it suffered as a result of Defendants' unfair acts and practices because

14   Defendants made every effort to obscure and conceal from Palantir the existence and extent of its

15   harmful acts and practices.

16   92.    Defendants' unlawful, unfair and fraudulent business acts and practices were

17   carried out and effectuated in California and injured Plaintiff in California.

18   93.    Plaintiff suffered harm as herein alleged as a direct and proximate result of

19   Defendants' unlawful, unfair and fraudulent business acts and practices.

20   94.    Plaintiff is entitled to an injunction enjoining Defendants from such further

21   violations of the UCL.  Any such injunction will benefit Plaintiff and the general public.

22

23   **FOURTH CAUSE OF ACTION**

24   **(Violation of Cal. Civ. Code § 3426 et seq. – Against All Defendants)**

25   95.    Palantir hereby realleges, as if set forth fully herein, the allegations of paragraphs 1

26   through 94.

27

28

96.     Palantir's confidential and proprietary information pertaining to its projects, including those concerning use of data analysis in the Healthcare Technology, Cyber Insurance and Cybersecurity Technology, and Natural Resources Exploration Technology, constitute protectable trade secrets as set forth in California Civil Code § 3426.1(d).

97.     Palantir's confidential and proprietary information derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from their disclosure or use as set forth in California Civil Code § 3426.1(d)(1).

98.     Palantir's confidential and proprietary information is the subject of efforts that are reasonable under the circumstances to maintain their secrecy as set forth in California Civil Code § 3426.1(d)(2).

99.     Palantir did not consent to the use of any of its trade secrets by anyone other than authorized employees using them for Palantir's business purposes and customers bound by confidentiality obligations.

100.    Defendants willfully and intentionally misappropriated Palantir's trade secrets when, *inter alia*, he used them to develop patent and trademark applications claiming inventorship and ownership of Palantir's systems, methods and concepts.  Palantir is informed and believes that Defendants have used, and continues to use, Palantir's trade secret, confidential, and proprietary information to develop a competing business or in furtherance of that goal, including those described in his trademark and patent applications.

101.    Palantir is entitled to an injunction of both actual and threatened misappropriation as set forth in California Civil Code § 3426.2(a).

102.    Palantir also requests that the court take affirmative acts to protect Palantir's trade secrets, as set forth in California Civil Code § 3426.2(c), including ordering an inspection of Defendants' computer(s), USB drives, email accounts, cloud storage accounts and other sources and equipment by a forensics expert to determine the extent to which Palantir's trade secrets were wrongfully taken and/or disseminated to others, and to ensure that no trade secrets belonging to

Palantir remain saved on those systems; and issue a writ of possession, a preliminary injunction, and a permanent injunction ordering the return of Palantir's confidential information and prohibiting Defendants from continuing his unlawful actions.

103.    In addition to equitable relief, Palantir demands monetary damages, fees, and costs, where allowed.

104.    Defendants' conduct as alleged herein was willful, malicious and wanton, and undertaken for the purpose of injuring or causing injury to Palantir.  Palantir seeks exemplary and punitive damages against Defendants.

## **PRAYER FOR RELIEF**

WHEREFORE, Palantir respectfully requests the following relief:

1.    Judgment in favor of Palantir and against all Defendants on all of Palantir's claims asserted in the Complaint;

2.    For a preliminary injunction and permanent injunction restraining Defendants, their officers, agents, servants, employees, and all persons acting in concert or participation with them from:

      a.    perpetuating the wrongful acts and conduct as set forth above;

      b.    continuing to pursue Defendants' patent applications set forth above;

      c.    directly or indirectly retaining, using or disclosing Palantir's trade secret, confidential and/or proprietary information, and derivatives thereof;

      d.    destroying any property, emails, documents or materials that are relevant or potentially relevant to this action;

      e.    moving or transferring outside the United States Palantir's property, emails, documents or materials that are relevant or potentially relevant to this action;

3.    For an Order requiring that Palantir's confidential, proprietary and trade secret information be returned to Palantir;

22

1    4.    For an Order requiring all Defendants to divulge the identity of the individuals,

2  groups and companies to whom they have disclosed Palantir's confidential, proprietary and trade

3  secret information;

4    5.    For an Order requiring all Defendants to account for and pay to Palantir all ill-gotten

5  gains, profits, and savings obtained or derived from their improper conduct;

6    6.    For damages, unjust enrichment, and/or reasonable royalties in amounts to be

7  proven at trial;

8    7.    For an Order awarding Palantir punitive and/or exemplary damages in a sum to be

9  determined at trial, on the basis of Defendants' willful, deliberate, and malicious tortious conduct;

10    8.    For restitution and disgorgement of all ill-gotten gains unjustly obtained and

11  retained by Defendants through the acts complained of herein;

12    9.    For prejudgment interest;

13    10.    For an Order awarding Palantir its attorney's fees and all costs of suit incurred

14  herein; and

15    11.    For such other and further relief as the Court deems just and proper.

16

17  Dated: May 5, 2017                         BOIES, SCHILLER & FLEXNER LLP

18

19                                            By:
                                              David Zifkin (SBN 232845)
20                                            (dzifkin@bsfllp.com)
                                              Shira Liu (SBN 274158)
21                                            (sliu@bsfllp.com)
                                              401 Wilshire Boulevard, Suite 850
22                                            Santa Monica, CA 90401
                                              Telephone: (310) 752-2400
23                                            Facsimile: (310) 752-2490
24
                                              David Boies (*Pro Hac Vice* pending)
25                                            (dboies@bsfllp.com)
                                              333 Main Street
26                                            Armonk, NY 10504
                                              Telephone: (914) 749-8200
27

28

Facsimile:   (914) 749-8300

John T. Zach (*Pro Hac Vice* pending)
(jzach@bsfllp.com)
575 Lexington Avenue, 7th Floor
New York, NY 10022
Telephone: (212) 446-2300
Facsimile: (212) 446-2350

Carlos M. Sires (*Pro Hac Vice* to be filed)
(csires@bsfllp.com)
401 East Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301
Telephone: (954) 356-0011
Facsimile: (954) 356-0022

Kaitlyn Murphy (SBN 293309)
(kmurphy@bsfllp.com)
1999 Harrison St., Suite 900
Oakland, CA 94612
Telephone: (510) 874-1108
Facsimile: (510) 874-1460

*Attorneys for Plaintiff* PALANTIR TECHNOLOGIES INC.

Jay P. Lefkowitz  (*Pro Hac Vice* pending)
(lefkowitz@kirkland.com)
Nathaniel J. Kritzer  (*Pro Hac Vice* pending)
(nathaniel.kritzer@kirkland.com)
Kirkland & Ellis LLP
601 Lexington Ave,
New York, NY 10022
Telephone: (212) 446-4800
Facsimile: 212) 446-4900

*Attorneys for Plaintiff* PALANTIR TECHNOLOGIES INC.

24

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.

Dated: May 5, 2017

**BOIES, SCHILLER & FLEXNER LLP**
**KIRKLAND & ELLIS LLP**

By: _____
David Zifkin (SBN232845)
(dzifkin@bsfllp.com)
Shira Liu (SBN 274158)
(sliu@bsfllp.com)
BOIES, SCHILLER & FLEXNER LLP
401 Wilshire Boulevard, Suite 850
Santa Monica, CA 90401
Telephone: (310) 752-2400
Facsimile: (310) 752-2490

David Boies (*Pro Hac Vice* appl. pending)
(dboies@bsfllp.com)
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, NY 10504
Telephone: (914) 749-8200
Facsimile: (914) 749-8300

John T. Zach (*Pro Hac Vice* appl. pending)
(jzach@bsfllp.com)
BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue, 7th Floor
New York, NY 10022
Telephone: (212) 446-2300
Facsimile: (212) 446-2350

Carlos M. Sires (*Pro Hac Vice* to be filed)
(csires@bsfllp.com)
BOIES, SCHILLER & FLEXNER LLP
401 East Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301
Telephone: (954) 356-0011
Facsimile: (954) 356-0022

Kaitlyn Murphy (SBN 293309)
BOIES, SCHILLER & FLEXNER LLP

25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

(kmurphy@bsfllp.com)
1999 Harrison St., Suite 900
Oakland, CA 94612
Telephone: (510) 874-1108
Facsimile: (510) 874-1460

Jay P. Lefkowitz (*Pro Hac Vice* pending)
(lefkowitz@kirkland.com)
Nathaniel J. Kritzer (*Pro Hac Vice* pending)
(nathaniel.kritzer@kirkland.com)
KIRKLAND & ELLIS LLP
601 Lexington Ave
New York, NY 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

*Attorneys for Plaintiff* PALANTIR TECHNOLOGIES
INC.