# EXHIBIT K

Page 1

SUPERIOR COURT OF THE STATE OF CALIFORNIA
COUNTY OF SANTA CLARA
BEFORE HONORABLE MARY ARAND, DEPT 9

```
PALANTIR TECHNOLOGIES, INC.  )
                             )
            Plantiff,        )        16-CV-299476
vs.                          )
                             )
MARC L. ABRAMOWITZ, et al    )
                             )
            Defendants.      )
```

REPORTER'S TRANSCRIPT OF PROCEEDINGS
MAY 18, 2018
10:15 AM

```
Official            MAGNA LEGAL SERVICES
Reporter Pro Tem:   By: Katherine Chok, CSR 9209
                    866.624.6221
                    www.MagnaLS.com
```



```
 1                APPEARANCES OF COUNSEL
 2
 3   FOR PLAINTIFF:      BOIES SCHILLER FLEXNER LLP
 4                       By: DAVID ZIFKIN, ESQ.
 5                       By: JOHN T. ZACH, ESQ.
 6                        By: KAITLYN MURPHY, ESQ.
 7                       401 WILSHIRE BLVD
 8                       SUITE 850
 9                       SANTA MONICA, CA 90401
10                       (310) 752-2400
11                       dzifkin@bsfllp.com
12                       jzach@bsfllp.com
13                       kmurphy@bsfllp.com
14
15
16   FOR DEFENDANT    SKADDEN ARPS
17                       By: ALLEN RUBY, ESQ
18                          WILLIAM CASEY, ESQ.
19                          STEVE WOHLGEMUTH, ESQ.
20                          525 UNIVERSITY AVENUE
21                          PALO ALTO, CA 94301
22                          (650) 470-4500
23                          allen.ruby@skadden.com
24                          william.casey@skadden.com
25
26
27
28
```



1  meetings, the interactions, the types of work that he
2  was working on with us.
3           So he has taken those secrets and put them in
4  the applications.  They actually reflect what he got
5  from us through those series of meetings.
6           JUDGE ARAND:  I'm still struggling with the
7  question of:  What did Palantir have before he showed
8  up?
9           MR. ZACH:  Well, they had exactly what's in
10 the patent applications, which is -- these describe
11 technologies, ideas, business -- you know, business
12 ideas that the company was working on.
13          Once we get to discovery and go to trial, we
14 would prove our case by calling numerous witnesses from
15 these teams that had these meetings with Mr. Abramowitz,
16 and go through the -- his role in sort of spitballing
17 some of these ideas, advising on these ideas, and the
18 back and forth.
19          There isn't just an encyclopedia of these.
20 It's an evolving set of interactions that he had.
21 That's why we rely on the applications.  It's the
22 clearest way to demark these things now.
23          Discovery is going to go through the specific
24 individuals, the specific meetings, the specific
25 documents, and that's going to be a whole lot of stuff.
26          But for purposes of disclosing and explaining
27 and drawing a line so we can go forward, his
28 applications represent what he learned from us in a



```
 1  confidential relationship.
 2          MR. RUBY:  Your Honor, as a spectator to this
 3  interchange, I don't believe -- I'm not being critical,
 4  but I don't believe that the Court got an answer to its
 5  question.  And I'm not sure that was an accident.
 6          I understand the concept -- I thought the
 7  Court's question was clear:  In what form was the trade
 8  secret extant; how did it exist before these various
 9  legal documents were created?  Was it in a notebook?
10  You know, take one extreme, maybe for all we know
11  Palantir would say that they have a system of keeping
12  track of their trade secrets.  Imagine that, that
13  there's a notebook for something that says --
14          JUDGE ARAND:  Many companies do that, yes.
15          MR. RUBY:  Maybe they keep it electronically.
16          I think Counsel's observation that Palantir
17  has electronic records is probably not -- I know it's
18  not responsive and probably not a shocking idea.  But in
19  some fashion, the idea that the owner of a trade secret
20  knows where it is.  And the idea that it's just in
21  somebody's mind -- Counsel didn't quite say that, but if
22  it's just in someone's mind, what if that person, if
23  truly fit literally, when she walks out the door,
24  there's no more trade secret to the company.  That seems
25  like an odd way to do business.
26          If they're saying or not saying -- if what
27  they don't want to say is there was no recordkeeping of
28  trade secrets.  There was no corporeal,
```



Page 12

```
 1   C-O-R-P-O-R-E-A-L, no physical manifestation or
 2   electronic manifestation of the trade secret, then it
 3   wasn't a trade secret.  Because as we know, the statute
 4   requires that information has independent economic
 5   value.
 6            Well, if it doesn't exist in the physical
 7   world, then it's pretty hard to say it had economic
 8   value.  I think maybe that's why they are trying to
 9   skirt the point. It is a profound question, if you will.
10   And the absence of an answer is profoundly
11   consequential.
12            The trade secret is not the patent
13   application, we know that.  The trade secret is the
14   information, process, formula which pre-existed that, as
15   the Court has pointed out.  And the inquiry into how did
16   it exist?  Was it written down somewhere?  Was it in
17   electronic record?  I think we have the answer -- not
18   willingly from them, but there was no such thing.  Which
19   is why they are having such a hard time with what should
20   be a very easy task, which is to reproduce the
21   definition or the substance of the trade secret which,
22   if it existed, would be somewhere in the records and
23   files and history of this company and could be just
24   transferred over.
25            But they, for sure, haven't done that. They
26   admit they haven't done that.  So what have they done?
27   I'll stop arguing.
28            For now, I'm just observing this interchange.
```



Page 13

```
 1   I think the unwillingness of Palantir to answer the
 2   Court's question is understandable and telling and might
 3   foreclose the need to go very much further beyond this.
 4           MR. ZACH:  Your Honor, respectfully, we did
 5   answer the question.  This is a case where
 6   Mr. Abramowitz was routinely in the office working with
 7   teams.
 8           JUDGE ARAND:  Let me ask a question:  In what
 9   state of the history of the company did Mr. Abramowitz
10   become involved?
11           MR. ZACH:  He became involved with the company
12   13 years ago.
13           JUDGE ARAND:  In what sense?
14           MR. ZACH:  It was initially shareholder.  And
15   over time he became a confidant of the management of the
16   company.  And over time he was inserted into teams of
17   different folks that work at the company that were
18   working on different projects because he was giving --
19   viewed as a trusted advisor, and he was giving advice on
20   these various different aspects of the company's
21   operations.  So he was routinely around these groups of
22   people working on these projects that are reflected in
23   these five different areas.
24           I think a helpful fact for that is in the
25   discussion for the status conference, you know, in one
26   of our meet and confers, you know, we were told, Well,
27   Mr. Abramowitz is going to have to take 50 depositions
28   in this case.  But he was dealing with so many different
```



Page 14

1  people, because he was working with these sets of teams
2  and these groups of employees over --
3           JUDGE ARAND:  When exactly did that start?  So
4  he starts off as a shareholder.  When did he actually
5  show up physically at the company and start working,
6  giving advice and things like that?
7           MR. ZACH:  Sure, Your Honor.  For example,
8  between 2010 and 2015 he was a regular fixture at
9  Palantir, right.  And that culminated in 2014 when he
10 was actually asking for an office at the company.
11          These are allegations that are actually in the
12 Complaint.  We talked a bit about this in the informal
13 setting.  But this isn't a case where he's just -- you
14 hear "shareholder," and you think, Oh, it's just a
15 stockholder's meeting.  This was someone who was
16 repeatedly visiting there dozens and dozens of times and
17 sitting on the teams.  And he worked on these projects
18 and had access to a whole -- he was permitted that
19 access.
20          So it's not a case -- we answered the
21 question, because it was an evolving set of knowledge
22 over time.  And it's a mixture of talking with the team
23 and being exposed to presentations, being exposed to
24 documents.  But it was a large, lengthy process.
25          And for purposes of what we're doing here,
26 we're trying to set the lines to guide discovery.  And
27 so the Court can sort of guide discovery and so the
28 defendants know what they're up against.



```
 1              The next step is to meet with those --
 2              JUDGE ARAND:  We're not there yet.  I'm still
 3   trying to sort out.  So are you suggesting that he
 4   played an integral role in developing the trade secrets
 5   of Palantir?
 6              MR. ZACH:  What I'm saying is that he advised,
 7   he was exposed to, things were bounced off of them. We
 8   created them.  We're taking ownership.  But he was
 9   consulted on it.  He was advised.  He is a smart guy.
10   He was well-respected by management, by very senior
11   people in the company.  So they wanted his take on
12   things.  They wanted his input on things.
13              For example, you'll see in this disclosure, we
14   don't cite to every claim, right.  We only cite to
15   claims that are ours.  We leave out a variety of claims
16   from his own patent applications that we didn't come up
17   with. The only stuff that we're claiming for this
18   purpose is the stuff we came up with.
19              This isn't a case where we just threw the
20   application at them and said, It's all ours.
21              MR. RUBY:  I still don't think the Court got
22   an answer to its original question.
23              This is all about, Counsel wants to talk about
24   their theory of how the information was transmitted to
25   Mr. Abramowitz.
26              They've said it several times.  But that
27   doesn't illuminate the question of when the trade secret
28   came into existence, and in what form and how does
```

